UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UMB BANK, N.A., solely in its capacity as Successor Trustee under the Trust Indenture dated September 20, 2017 regarding €500,000,000 5.250% Senior Notes due 2024 issued by Intralot Capital Luxembourg S.A.,

Plaintiff,

v.

INTRALOT CAPITAL LUXEMBOURG S.A., INTRALOT S.A, INTRALOT GLOBAL HOLDINGS B.V., INTRALOT, INC., INTRALOT US SECURITIES B.V., INTRALOT U.S. HOLDINGS B.V., and THE LAW DEBENTURE TRUST CORPORATION P.L.C., SOLELY IN ITS CAPACITY AS SECURITY AGENT,

Defendants.

## **COMPLAINT**

Plaintiff UMB BANK, N.A., solely in its capacity as Successor Trustee under the Trust Indenture dated September 20, 2017 regarding €500,000,000 5.250% Senior Notes due 2024 issued by Intralot Capital Luxembourg S.A. ("**UMB**"), by and through its undersigned attorneys, alleges as follows for its Complaint against Intralot Capital Luxembourg S.A. (the "**Issuer**"), Intralot S.A. (the "**Company**"), Intralot Global Holdings B.V. ("**IGH**"), and Intralot, Inc., Intralot US Securities B.V. ("**TopCo**") and Intralot U.S. Holdings B.V. ("**HoldCo**") (Intralot Inc., TopCo and HoldCo shall be collectively referred to as "**Intralot US,**" and together with the Issuer, the Company, and IGH, the "**Intralot Entities**"), and The Law Debenture Trust Corporation p.l.c. (the "**Security Agent**" and together with the Intralot Entities, the "**Defendants**"):

**NATURE OF THE ACTION**

1.      Plaintiff UMB is the Successor Trustee under the Trust Indenture dated September 20, 2017 regarding €500,000,000 5.250% Senior Notes due 2024 (the "**2024 Notes**") issued by Intralot Capital Luxembourg S.A. ("**2024 Indenture**").[1]

2.      This action arises out of the Intralot Entities' breach of various provisions of the 2024 Indenture in connection with a collusive and coercive integrated transaction engineered by the Intralot Entities to impermissibly strip the 2024 Notes of their bargained-for credit protection of the Intralot Entities' most valuable asset so that asset could be used solely as security for holders of a separate series of notes issued by the same Issuer and ranking *pari passu* with the 2024 Notes, but which had a scheduled maturity date last year shortly after the Intralot Entities consummated their illicit scheme—*i.e.*, the €250,000,000 6.75% Senior Notes due in September 2021 (the "**2021 Notes**").

3.      As the maturity date for the 2021 Notes approached, the Intralot Entities recognized that they lacked the means to redeem them and that such payment failure would result in a cross-default of the 2024 Notes.  Typically, a debtor facing such a prospect would either renegotiate its outstanding debt in a manner that grants comparable treatment to similarly situated creditors or commence a court-supervised insolvency proceeding.  The Intralot Entities apparently viewed the first of these options as too expensive and were unwilling to accept the loss of current ownership's control over the enterprise that would result from any insolvency proceeding, as the current ownerships' equity value was negative.  So, in collusion with certain holders of the 2021 Notes, the Intralot Entities devised a third option: to induce holders of the 2021 Notes (the "**2021**

---

[1]  A true and correct copy of the 2024 Indenture is attached hereto as Exhibit A.

**Noteholders**") to refinance the maturing debt by offering them a sweetheart deal at the expense of the holders of the 2024 Notes (the "**2024 Noteholders**").[2]

4.     The terms of the collusive bargain, which were agreed to after the Intralot Entities negotiated exclusively with a select group of 2021 Noteholders, were set forth in the Exchange Offer and Consent Solicitation Memorandum and the Information Memorandum with respect to the 2021 Notes (the "**2021 Exchange Offer**"), and in the Exchange Offer Memorandum and Information Memorandum with respect to the 2024 Notes (the "**2024 Exchange Offer**" and together with the 2021 Exchange Offer, the "**Exchange Offers**").

5.     Pursuant to the Exchange Offers, in exchange for surrendering their 2021 Notes, and thus allowing the Issuer to avoid an inevitable default, holders of the 2021 Notes received Senior Secured PIK Toggle Notes (the "**New Preferential Secured Notes**") issued by Intralot, Inc., which is the Intralot Entities' principal U.S. operating subsidiary and crown jewel that at the time generated over 70% of its EBITDA and earnings.  Unlike the 2021 Notes, which were unsecured and rank equally with all other unsecured debt (such as the 2024 Notes), the New Preferential Secured Notes are secured by both the assets and equity of Intralot US, structurally senior, and contractually senior due to an intercompany subordination agreement entered into in connection with the issuance of the New Preferential Secured Notes.

6.     For the 2024 Noteholders, however, the Exchange Offers presented a Hobson's choice.  They could either: (a) exchange some undetermined portion of their 2024 Notes for a minority equity interest in TopCo, Intralot Inc.'s indirect parent, and thereby accept a structurally

---

[2] True and correct copies of the 2021 Exchange Offer and 2024 Exchange Offer are attached hereto as Exhibits B and C, respectively.

subordinated position relative to the 2021 Notes (the proposed minority stake in TopCo would leave only the indirect equity of TopCo's subsidiaries as a source of recoveries for the 2024 Notes, structurally subordinating them for any future distressed resolutions), as well as contractually subordinated due to the intercompany subordination agreement, or (b) keep their 2024 Notes, but without recourse to Intralot, Inc.— the Intralot Entities' primary revenue source— because pursuant to the 2021 Exchange Offer, that crown jewel entity was released as a guarantor of the 2024 Notes and its assets and its stock pledged to secure the New Preferential Secured Notes.

7.      The 2024 Indenture of course contained prohibitions designed to, and which in fact did, prevent the Intralot Entities from undermining the rights of the 2024 Noteholders.  In an effort to evade those rights, acting in bad faith, the Intralot Entities orchestrated a carefully timed sequencing of the various components of the Exchange Offers with the intent of manipulating, and artificially decreasing, the value of the Company's ownership of TopCo so it could designate Intralot US as Unrestricted Subsidiaries under the 2024 Indenture (the "**Sequencing Scheme**"). Only if (and after) each entity comprising Intralot US was designated as an Unrestricted Subsidiary could the Intralot Entities pledge Intralot US's assets to the 2021 Noteholders and remove Intralot US as guarantors of the 2024 Notes.

8.      To that end, the first step in the Sequencing Scheme was to recognize the exchange of 2024 Notes for equity in TopCo, as contemplated by the 2024 Exchange Offer, which purportedly reduced the Company's ownership interest in TopCo from 100% to 65%.

9.      The second step in the integrated Sequencing Scheme was to cause Intralot, Inc. to issue the €202 million of New Preferential Secured Notes to the 2021 Noteholders in exchange for their 2021 Notes, as contemplated by the 2021 Exchange Offer.  As part of the Sequencing

Scheme, however, the New Preferential Secured Notes were intended to be unsecured for at least an instant because the Intralot US entities were still Restricted Subsidiaries such that the liens and other security promised in the 2021 Exchange Offer could not yet be given.

10.     Immediately after the New Preferential Secured Notes were issued, and before the Intralot US entities were designated Unrestricted Subsidiaries, Intralot US could not have waived the guarantees; therefore, at that point in time, Intralot, Inc. received no consideration in exchange for the New Preferential Secured Notes, which purportedly allowed the Intralot Entities to take the position that the value of Intralot, Inc. was thereby reduced by €202 million.

11.     At 12:01 am London time on the day immediately after the closings of the Exchange Offers, the Company used the newly-diluted value of its now reduced ownership interest in TopCo to justify converting Intralot US from Restricted Subsidiaries to Unrestricted Subsidiaries under the terms of the 2024 Indenture.  Had the Company determined the fair market value of Intralot US in good faith, as required under the 2024 Indenture, prior to the closing of the Exchange Offers and without regard to the Sequencing Scheme, its value would have far exceeded the limitations imposed in the 2024 Indenture for the contemplated designation.

12.     The conversion of the Intralot US entities to Unrestricted Subsidiaries paved the way for the fourth and final step in the Sequencing Scheme, and at 12:02 London time, one minute after converting the Intralot US entities to Unrestricted Subsidiaries, the Company caused Intralot, Inc. to issue a €202 million lien on its assets, including its outstanding equity, thereby securing the New Preferential Secured Notes issued in favor of the 2021 Noteholders and stripping the 2024 Notes of the credit backing of Intralot US.  There was no commercial explanation for these

machinations; the only reasonable explanation is the Company's bad faith attempt to evade the express limitations imposed on it under the 2024 Indenture.

13. In addition, the Company entered into a subordination agreement through which it agreed that intercompany debt related to Intralot US would be subordinated to the New Preferential Secured Notes issued to the 2021 Noteholders. The subordination agreement essentially prevents funds from Intralot US from flowing up to the Company and its other subsidiaries unless and until the New Preferential Secured Notes are paid in full.

14. The scheme, including the Sequencing Scheme, was facilitated by a small subset of 2024 Noteholders that directly, or through affiliates, held substantial positions in both the 2021 Notes and 2024 Notes — BP Holdings K. LP, Centre Street Investment S.à r.l., the Indiana Public Retirement System and SCF Investment II S.à r.l. (collectively, the "**Cross Holders**"). These Cross Holders were spared the devastating effects of the collusive and illicit transaction because they received preferential treatment via a "backstop" arrangement to induce their participation, in addition to vastly improving their credit position with regard to their 2021 Notes by receiving the New Preferential Secured Notes in exchange.

15. The preferential terms offered to the Cross Holders were not offered to the overwhelming majority of 2024 Noteholders and they were only offered to the Cross Holders to buy their approval of the Exchange Offers.

16. The scheme violated several covenants in the 2024 Indenture that were in place to protect the 2024 Noteholders from losing the credit protections provided in the 2024 Indenture, including the guarantees of the Company and its Restricted Subsidiaries.

17.     On or about August 3, 2021, the Exchange Offers were consummated over the objection of certain holders of the 2024 Notes.  In other words, each Defendant proceeded with full knowledge that 2024 Noteholders were objecting.

18.     At the time of the Exchange Offers, The Law Debenture Trust Corporation p.l.c. ("**Law Debenture**") was the trustee under both the 2021 and 2024 Indentures.  Effective January 28, 2022, an instrument of removal, appointment and acceptance was entered into among the Issuer, Law Debenture and UMB providing for the removal of Law Debenture as trustee and the appointment of UMB as successor trustee under the 2024 Indenture.

19.     UMB, as successor trustee under the 2024 Indenture, seeks damages and equitable relief, including rescission, against the Intralot Entities for breach of the 2024 Indenture.

**THE PARTIES**

20.     UMB is a national banking association with its principal office located in Kansas City, Missouri.

21.     Defendant, Intralot Capital Luxembourg S.A. (the Issuer) is a public limited liability company incorporated under the law of the Grand Duchy of Luxembourg with its registered office at 46A, avenue J.F. Kennedy, L-1855 Luxembourg, and registered with the Luxembourg Register of Commerce and Companies under number B186753.  The Issuer is a wholly-owned subsidiary of Intralot Global Securities B.V. ("**IGS**").

22.     Defendant Intralot S.A. (the Company) is a public limited liability company (*société anonyme*) incorporated under the laws of the Hellenic Republic with a principal place of

business at 64, Kifissias Ave. & 3, Premetis Str., 112 57 Athens, Greece.  The Company is the parent company of the Issuer and a guarantor of the 2024 Notes.

23.     Defendant IGH (or Intralot Global Holdings B.V.) is a private limited company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated under the law of the Netherlands with a principal place of business at Delflandlaan 1, 1062 EA, Amsterdam, Netherlands.  IGH is a wholly-owned subsidiary of Intralot Global Securities B.V.  IGH is a Subsidiary Guarantor under the 2024 Notes, as that term is defined below.  IGH is an indirect parent company of the Intralot US entities.

24.     Defendant Intralot, Inc. is a corporation organized and existing under the laws of the State of Georgia in the United States of America with a principal place of business at 11360 Technology Cir, Duluth, GA 30097.  Intralot, Inc. is a Subsidiary Guarantor under the 2024 Notes, as that term is defined below.  Intralot, Inc. is also the issuer under the indenture for the New Preferential Secured Notes (the "**New 2021 Preferential Indenture**"). The Intralot US entities represent more than 70% of both the EBITDA and earnings of the group of entities that had been supporting the 2024 Notes and is thus the Intralot Entities' economic engine and their crown jewel.

25.     Defendant TopCo (or Intralot US Securities B.V.), is a private limited company incorporated under the law of the Netherlands with a principal place of business at Delflandlaan 1, 1062 EA, Amsterdam, Netherlands.  TopCo is a guarantor under the New 2021 Preferential Indenture and contributed collateral preferentially for the benefit of the New Preferential Secured Notes.

26.     Defendant HoldCo (or Intralot U.S. Holdings B.V.), is a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*), incorporated under the law of

the Netherlands with a principal place of business at Delflandlaan 1 Office 919 1062 EA, Amsterdam, Netherlands.  HoldCo holds the stock of Intralot, Inc. and is a guarantor under the New Preferential Secured Notes.

27.    Defendant Law Debenture is a limited liability company incorporated in England and Wales with registered number 1675231, whose registered office is at Fifth Floor, 100 Wood Street, London EC2V 7EX, England.  Law Debenture is the trustee and Security Agent for the New Preferential Secured Notes.  Law Debenture is named as a defendant herein solely in its capacity as the Security Agent holding the security for the New Preferential Secured Notes issued to the former 2021 Noteholders.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1348 because there is complete diversity of citizenship between Plaintiff UMB and Defendants and the amount in controversy exceeds $75,000.

29.    This Court has personal jurisdiction over the Issuer, the Company, IGH, and Intralot US because each of those Defendants agreed in § 14.09 of the 2024 Indenture that "any suit, action or proceeding arising out of or based upon this indenture, any Guarantee or the notes may be instituted in any state or federal court in the Borough of Manhattan, New York, New York . . . and each of them irrevocably submits to the non-exclusive jurisdiction of such courts in any suit, action or proceeding."

30.    This Court has personal jurisdiction over the Law Debenture Trust Corporation p.l.c. in its capacity as Security Agent and trustee for the New Preferential Secured Notes because

the security at issue is located in this District and UMB's claims arise, in part, out of The Law Debenture Trust Corporation p.l.c.'s contacts with the forum.

31.     This Court has personal jurisdiction over TopCo because TopCo is availing itself of the United States markets by offering its stock in the 2024 Exchange Offer under the private placement exemption and, on information and belief, targeting eligible holders within the United States.

32.     This Court has personal jurisdiction over HoldCo because it pledged stock in assets located in the United States to the Security Agent on behalf of the holders of the New Preferential Secured Notes.

33.     Venue is proper in the district based on § 14.09 of the 2024 Indenture which provides that "The Issuer and each Guarantor irrevocably waive, to the fullest extent permitted by law, any objection to any suit, action, or proceeding that may be brought in connection with this Indenture, ... in [this Court] whether on the grounds of venue, residence or domicile or on the ground that any such suit action or proceeding has may be brought in an inconvenient forum."

## FACTS AND GENERAL ALLEGATIONS

**A.     The Company and the Notes**

34.     The Intralot Entities are an international gaming enterprise in the business of providing integrated gaming systems and services in a number of countries around the world.  The Intralot Entities design, develop, operate and support customized software and hardware for the gaming industry, providing technology and management services to state and state-licensed lottery and gaming organizations worldwide.

35.     The Issuer is a special purpose finance vehicle that issued the 2024 Notes in 2017. The 2024 Notes pay interest at a rate of 5.250% per annum, payable semi-annually on March 15 and September 15 of each year, and mature on September 15, 2024 and, prior to the 2024 Exchange Offer, had an outstanding amount of €500,000,000.00.

36.     The 2024 Notes are general obligations of the Issuer and guaranteed by the Company and certain "Subsidiary Guarantors," including, prior to the consummation of the Exchange Offers, Defendants Intralot US and IGH.

37.     The Issuer also issued the 2021 Notes.  The 2021 Notes, prior to the consummation of the Exchange Offers, had an outstanding amount of €250,000,000 and paid interest at a rate of 6.750% per annum, payable semi-annually on March 15 and September 15 of each year, and would have matured on September 15, 2021.

38.     The material terms of the 2021 Notes and 2024 Notes were essentially identical except for their maturity date and interest rate.  They ranked *pari passu* in right of payment with each other and all existing and future debt of the Issuer that is not subordinated in right of payment to the 2024 Notes and were guaranteed by the same entities.  The primary difference between these Notes is that the 2021 Notes would have matured earlier, in September 2021, absent the occurrence of a cross-default.

39.     Had the Issuer been unable to pay the 2021 Notes in full upon maturity last September, there would have been an Event of Default on the 2021 Notes (as defined therein), and therefore a cross-default under the 2024 Notes.  As a consequence of such default, the full amount of both series of notes would have become immediately due and payable and the 2021 Noteholders and 2024 Noteholders would have been entitled to receive *pro rata* distributions—the 2024

Noteholders would have received two-thirds of the distribution and the 2021 Noteholders would have received the remaining one-third.  At all relevant times the Intralot Entities  were aware that an Event of Default on the 2021 Notes was likely to occur and that would cause a cross-default under the 2024 Notes.

**B.      The 2024 Indenture**

40.      The 2024 Indenture places certain limitations on the ability of most of the Intralot Entities, including the Company and the other Defendants (the latter referred to herein as "**Restricted Subsidiaries**"), to engage in particular transactions.

41.      Section 4.10 of the 2024 Indenture governs "Limitation on Liens" and prohibits the Company and any "Restricted Subsidiary" from incurring liens, except for "Permitted Liens," unless the 2024 Notes are granted an equal and ratable lien.

42.      Section 4.07 of the 2024 Indenture limits the ability of the Company and its Restricted Subsidiaries to make "Restricted Investments," which are defined as investments that are not "Permitted Investments," and "Restricted Payments," which include dividends and stock repurchases.

43.      Section 1.01 of the 2024 Indenture allows the Company to make "Permitted Investments," which, Defendants have indicated had remaining capacity of €178 million: (a) up to €125 million in joint ventures; and (b) up to €60 million in "other Investments," less approximately €7 million that was previously used.[3]

---

[3]  *See* Sfatos Declaration ¶¶ 19, 29, 31.

44.     Section 1.01 of the 2024 Indenture provides that each Permitted Investment is to be measured according to its "Fair Market Value" on the date each such Investment was made.  The Indenture defines the Fair Market Value of an asset, in relevant part, as the sale value that would be realized in an "arm's length free-market transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy, as determined in good faith by the Board of Directors, chief executive officer, chief financial officer or responsible accounting or financial officer of" the Company.

45.     Subject to satisfying certain conditions, the 2024 Indenture permits the Company to change the designation of a Restricted Subsidiary to an Unrestricted Subsidiary, which would remove the limitations described above for the Unrestricted Subsidiary and eliminate that subsidiary as a guarantor of the 2024 Notes.

46.     Section 4.17(a) provides that the Company's board may designate a Restricted Subsidiary as Unrestricted only if the Fair Market Value of the Company's interest in the Restricted Subsidiary is less than the amounts available in either the Permitted Investments or Restricted Payments baskets:

> If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the Fair Market Value of [the Company's] interest in the Subsidiary so designated shall be deemed to be an Investment made as of the time of the Designation and shall reduce **either** (i) the amount available for Restricted Payments under Section 4.07 of this Indenture **or** (ii) the amount available for Permitted Investments, as determined by [the Company]. That Designation shall only be permitted if the Investment would be permitted at that time and if the  Restricted Subsidiary otherwise meets the definition of an Unrestricted Subsidiary.

(emphasis added).

**C.**     **The Company and the 2021 Noteholders Enter Into a Lock-Up Agreement and Engage in Coercive and Exclusionary Discussions**

47.     During the course of 2020, facing both insolvency and a looming (September 2021) maturity date for the 2021 Notes that it knew it could not meet, the Company began discussions with the members of an ad hoc group of 2021 Noteholders (the "**2021 Noteholder Group**") regarding the restructuring of the 2021 Notes and 2024 Notes.  The Company engaged in discussions exclusively with the 2021 Noteholder Group but excluded all 2024 Noteholders except the Cross Holders who owned both 2021 Notes and a smaller amount of 2024 Notes.

48.     In January 2021, the Company entered into a binding agreement with members of the 2021 Noteholder Group (the "**Lock-Up Agreement**"),[4] which was later extended and updated as discussions continued.  This Lock-Up Agreement, which grew to include holders of 90% of the 2021 Notes,[5] ensured that the contemplated exchange would provide for preferential treatment of the 2021 Notes over the 2024 Notes, even though there were twice as many 2024 Notes outstanding and the 2024 Notes had ranked *pari passu* with the 2021 Notes.

49.     Under the Lock-Up Agreement, the Company set out the terms of an integrated series of transactions to effectuate the exchange of the 2021 Notes and the 2024 Notes for new

---

[4]  *See* January 14, 2021 Press Release *Intralot enters into a binding lock-up agreement with key noteholders in support of the proposed capital structure optimisation transactions that will address its*
upcoming   maturities   and   materially   deleverage   its   balance   sheet available   at
https://www.intralot.com/files/INTRALOT_Announcement_Jan__14_2021_EN.pdf

[5]  *See* July 1, 2021 Press Release *INTRALOT provides an update on the Lock-up agreement and exchange offer process*  ("holders of more than 90% of the 2021 SUNs outstanding as of the date of this press release have agreed to tender their 2021 Notes pursuant to the Lock-up Agreement.") available                                                                                                                    at
https://www.intralot.com/files/PR_INTRALOT_Exchange_Offers_EN_01_07_2021.pdf

securities.  Neither exchange could occur, however, unless the minimum specified percentage of 2021 and 2024 noteholders participated in the 2021 Exchange Offer and 2024 Exchange Offer, respectively, confirming that all aspects of the exchange offers were integrated.

50.    Under the Lock-up Agreement, the 2021 Noteholders would receive the New Preferential Secured Notes.  The 2024 Noteholders, on the other hand, would receive only the opportunity to exchange their 2024 Notes for dramatically less valuable consideration— specifically, a minority share of the capital of TopCo, an indirect parent of Intralot, Inc.

51.    The binding Lock-Up Agreement required holders of more than 90% of the 2021 Noteholders to tender their 2021 Notes pursuant to the 2021 Exchange Offer and 13.64% of the 2024 Noteholders to tender their 2024 Notes pursuant to the 2024 Exchange Offer.

52.    Without the Cross Holders' participation in both offers, neither offer would have been consummated.  As discussed below, to obtain the Cross Holders' agreement to participate in the 2024 Exchange Offer, the Intralot Entities offered them preferential treatment.

**D.    The Integrated Scheme to Transfer Assets Available to Satisfy the 2024 Notes for the Benefit of Insider 2021 Noteholders**

53.    Following months of discussion with the 2021 Noteholder Group, on July 1, 2021, the Issuer announced collusive and preferential concurrent Exchange Offers.[6]  Each Exchange Offer was conditioned on the consummation of the other.  Moreover, if the 2024 Exchange Offer was not consummated, the New Preferential Secured Notes would immediately be in default.

---

[6]    *See* Press Releases summarizing the terms of the Exchange Offers available at https://www.intralot.com/files/Intralot_-_Press_Release__2021_Exchange_Offer_.pdf    and https://www.intralot.com/files/Intralot-_Press_Release__2024_Exchange_Offer_.pdf.

54.   The Exchange Offers and the transactions resulting therefrom, were consummated on or about August 3, 2021.[7]

55.   As a result of the Exchange Offers, participating 2021 Noteholders received €0.82 equivalent in New Preferential Secured Notes for every euro principal amount of 2021 Notes tendered.  The New Preferential Secured Notes were issued by Intralot. Inc. and were ultimately secured by a €202 million lien on its assets, including its shares held by Holdco.

56.   Participating 2024 Noteholders received 0.2894 ordinary shares of TopCo in exchange for each euro principal amount of 2024 Notes tendered in the exchange.  TopCo is the indirect parent of Intralot, Inc.

57.   The Cross Holders were exclusively granted the opportunity to appoint new directors of TopCo and veto rights over certain Intralot US transactions and therefore influence over the Intralot Entities' primary revenue generator, along with other incentives.

58.   Upon the settlement of the transactions contemplated by the Exchange Offers, the 2024 Noteholders (primarily the Cross Holders) owned 35% of TopCo, with the remaining 65% owned by the Company.

59.   Immediately upon the settlement of the transactions contemplated by the Exchange Offers, the Company designated the Intralot US entities as Unrestricted Subsidiaries under the

---

[7]   *See* August 3, 2021 Press Release announcing the settlement of the Exchange Offer https://www.intralot.com/files/Intralot__Press_Release_Successful_Settlement__04_08_21_.pdf ("This is to announce that the Exchange Offers and the Consent Solicitation settled successfully on 3 August 2021 and Intralot S.A. designated Intralot US Securities B.V. and its subsidiaries as 'Unrestricted Subsidiaries' under the indenture governing the 2024 Notes on 4 August 2021.")

2024 Indenture, so it could have those previously Restricted Subsidiaries provide the security for the New Preferential Secured Notes as contemplated by the 2021 Exchange Offer.

60.     Intralot, Inc. pledged its and its subsidiaries' assets, including intercompany indebtedness and bank accounts (the "**Intralot US Liens**") to secure the New Preferential Secured Notes, and HoldCo, a previously restricted subsidiary, granted a pledge on the stock of Intralot, Inc. (the "**Intralot US Stock Pledge**") to secure the New Preferential Secured Notes.  The Intralot US Liens and the Intralot US Stock Pledge were granted to the Security Agent on behalf of the holders of the New Preferential Secured Notes.

61.     In addition, and in furtherance of the integrated scheme, Intralot US and other previously restricted subsidiaries entered into a subordination agreement, which caused intercompany payables owed by any of these companies to the Company, the Issuer, Intralot S.A., Intralot Tech, or IGH to be subordinated to the New Preferential Secured Notes.

62.     Set forth below is a simplified and summarized corporate and financing structure chart indicating the structure after giving effect to the transactions consummated under the Exchange Offers (the €202 million New Preferential Secured Notes are the "$244.6 million New Notes" referenced in the chart).



### E.   The Exchange Offers and the Sequencing Scheme and the Violations of the 2024 Indenture

63.     The Exchange Offers were a scheme concocted by the Company and the Intralot Entities' management to preserve their control of the Intralot Entities and the Company's shareholders' "out of the money" control over Intralot US by purchasing the cooperation of the 2021 Noteholders and Cross Holders at the expense of the 2024 Noteholders who were not members of the Cross Holder group.

64.     The objective of the Exchange Offers was to take the Intralot US guarantees away from the 2024 Noteholders for the sole benefit of the 2021 Noteholders by way of the New Preferential Secured Notes, the €202 million lien, the Intralot US Stock Pledge and the Subordination Agreement.  To do that, the Company needed to re-designate Intralot US as

Unrestricted Subsidiaries under the 2024 Indenture, which required the Fair Market Value of Intralot US to be within the Company's available limits for Permitted Investments.

65.     In accordance with Section 4.17 of the 2024 Indenture, the Company could change the designation of the Intralot US entities from Restricted to Unrestricted Subsidiaries **only** if the Fair Market Value of the Company's ownership interest in Intralot US was less than the amount available to the Company to make **either** a Permitted Investment, no greater than €178 million, **or** a Restricted Payment, no greater than €40 million.

66.     Section 1.01 of the 2024 Indenture defines Fair Market Value of any asset or property as "the sale value that would be obtained in an arm's length free-market transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no compulsion to buy" and required the Company to determine the Fair Market Value in good faith.

67.     If the Company had calculated the Fair Market Value of Intralot US in good faith, its value would have exceeded the amount available to the Company to make a Permitted Investment.  Therefore, the Company's designation of Intralot US as Unrestricted Subsidiaries violated Section 4.17 of the 2024 Indenture.

68.     To avoid Section 4.17, the Company manipulated the value of its ownership interest in Intralot US in an effort to make it fit within its Permitted Investments basket.

69.     Each step in the Sequencing Scheme was carefully choreographed.  While the Exchange Offers closed essentially simultaneously and were part of an integrated transaction, the first step in the Sequencing Scheme was to recognize the exchange of the participating 2024

Noteholders' (primarily the Cross-Holders) Notes for 35% of the ownership interest in Intralot US. The Intralot Entities apparently believed this enabled the Company to consider only 65% of Intralot US's Fair Market Value in determining whether Intralot US's value fit within the Permitted Investment basket, which would allow the Company to designate Intralot US as an Unrestricted Subsidiary.  In other words, the Intralot Entities reduced the value of Intralot US by 35% when making its calculation of Fair Market Value, despite it being wholly-owned a minute prior to the calculation.

70.     The second step in the Sequencing Scheme was to cause Intralot, Inc. to issue €202 million worth of New Secured Preferential Notes to the 2021 Noteholders in exchange for their 2021 Notes pursuant to the 2021 Exchange Offer.  By saddling Intralot, Inc., still a Restricted Subsidiary, with €202 million of debt, for which Intralot US apparently received no consideration, the Company sought to reduce the Fair Market Value of Intralot, Inc. by €202 million for purposes of determining whether it could designate the Intralot US entities Unrestricted Subsidiaries.

71.     The key objective of the 2021 Exchange Offer was to secure the New Preferential Secured Notes with Intralot, Inc.'s assets.  However, at the closing, Intralot, Inc., was still a Restricted Subsidiary and the €202 million lien on its assets was not a Permitted Lien under the 2024 Indenture.  To skirt this prohibition, the 2021 Exchange Offer provided the New Preferential Secured Notes issued at the closing would be unsecured, for a moment, the failure of which would have resulted in an immediate event of default of the New Preferential Secured Notes.

72.     As explained in the 2021 Exchange Offer, the third step in the Sequencing Scheme was for the Company to designate the Intralot US entities Unrestricted Subsidiaries right after the closing—at 12:01 am London time the first business day after the closing.  The Company justified the designation of the Intralot US entities Unrestricted Subsidiaries by calculating the Fair Market

Value of Intralot US based on (a) the Company's now reduced ownership interest in TopCo (65% following the closing of the 2024 Exchange Offer), and (b) the €202 million debt it slapped on Intralot US (at the closing of the 2021 Exchange Offer).

73.     One minute after the Company designated the Intralot US entities Unrestricted Subsidiaries—at 12:02 am London time the first business day after the closing—the Company completed the fourth step of the Sequencing Scheme and caused Intralot, Inc. to issue a €202 million lien on its assets, including liens on intercompany indebtedness and bank accounts.  Thus, the Company fulfilled its obligation under the 2021 Exchange Offer to secure the New Preferential Secured Notes issued in favor of the 2021 Noteholders (including the Cross-Holders) and thereby strip the 2024 Notes of credit backing previously provided by Intralot US.

74.     Each step in the Sequencing Scheme was part of an integrated transaction with the closing of each Exchange Offer dependent on the closing of the other and each choreographed step depending on completion of the prior step.  If any of the steps in the 2024 Exchange Offer failed to occur and the Company consequently did not designate Intralot US an Unrestricted Subsidiary, the New Preferential Secured Notes issued in the 2021 Exchange would have defaulted and immediately become due and payable.  Because the Exchange Offers constituted an integrated transaction, the Sequencing Scheme was an improper fiction conjured to avoid the restrictions in the 2024 Indenture and improperly manipulate the Fair Market Value of Intralot US.  The Sequencing Scheme, including the re-designation of Intralot US as Unrestricted Subsidiaries violated the terms of the 2024 Indenture, including the Company's obligation to determine the Fair Market Value of a subsidiary to be re-designated in good faith.

75.     Even analyzed individually, however, the Company's transfer of 35% ownership interest in TopCo and Intralot, Inc.'s issuance of €202 million of debt violated the 2024 Indenture.

76.     Section 4.11 of the 2024 Indenture prohibits the Company and any Restricted Subsidiary from selling its ownership interest in Intralot US without receiving "consideration at the time of the Asset Sale at least equal to the Fair Market Value of the . . .Equity Interests issued or sold or otherwise disposed of."  The Company did not receive Fair market Value for its sale of 35% of its ownership interest in Intralot US.

77.     Using the Intralot Entities' own numbers, the transfer of 35% of Intralot US's equity was not for Fair Market Value.  The Intralot Entities have asserted that the Fair Market Value of Intralot US prior to transferring 35% of the equity interests and incurring €202 million of debt was approximately €386 million.[8]  Based on the Intralot Entities' numbers, the Fair Market Value of the 35% of the equity that was transferred was €135.1 million (calculated by multiplying 35% by the €386 million value the Intralot Entities attributed to Intralot US).  The amount of 2024 Notes exchanged for 35% of the equity interests in Intralot US was €118,240,000,[9] which is far less than the €135.1 million of equity value exchanged.

78.     The €202 million debt issued by Intralot, Inc, while a Restricted Subsidiary, was not a Permitted Debt under the 2024 Indenture.  The €202 million in debt was issued to refinance the Issuer's debt to the 2021 Noteholders.  The 2024 Indenture defines "Permitted Refinancing Debt" as "any Debt of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease, exchange, discharge or refund other Debt of such Person (other than intercompany Debt)."  The €202 million

---

[8]  *See* Sfatos Declaration, ¶ 31.
[9]   *See* July 30, 2021 Press Release *Intralot Global Holdings B.V. Announces Results of its Exchange Offer for Ordinary Shares in the Capital of Intralot US Securities B.V. and Satisfaction of a Minimum Acceptance Condition* at https://www.intralot.com/files/Syntax_-_Results_Press_Release__2024_Exchange_Offer_.pdf

Intralot, Inc. debt did not "extend, refinance, renew, replace, defease, exchange, discharge or refund other Debt" of Intralot, Inc., and therefore was not a Permitted Refinancing Debt.

79.    If the Company had calculated the Fair Market Value of Intralot US and its subsidiaries in good faith and without regard to the effects of the Sequencing Scheme, which is divorced from the methodology that would be used to value a company in an arm's length free-market transaction with no compulsion to buy or sell, its value would have exceeded the amount available to the Company to make a Permitted Investment.  Therefore, the Company's designation of the Intralot US entities as Unrestricted Subsidiaries violated Section 4.17 of the 2024 Indenture.

**F.    Change of Control**

80.    The term "Change of Control" is broadly defined in Section 1.01 of the 2024 Indenture to mean "the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), *in one or a series of related transactions*, of all or substantially all of the properties or assets of the Company and its Subsidiaries taken as a whole to any Person. . . ." (emphasis added).  Thus, a transfer, conveyance or disposition of "all or substantially all" of the assets of the Company, constitutes a "Change of Control."

81.    Pursuant to the Subordination Agreement, all intracompany debt between Intralot US and the Company and its other subsidiaries is subordinated to the New Preferential Secured Notes that the 2021 Noteholders received.  Thus, while the New Preferential Secured Notes are outstanding, revenue generated by Intralot US – which accounts for 70% of the Company's EBITDA – is essentially prevented from flowing up to the Company and its other Subsidiaries, further severing Intralot US from the Company, the Issuer, and the 2024 Notes.  This arrangement

constitutes a transfer, conveyance or disposition of "all or substantially all" of the Company's assets.

82.     Section 4.15(a) provides: "If a Change of Control occurs, each Holder of Notes shall have the right to require the Issuer (or the Company, if the Company makes the purchase offer referred to below) to repurchase all or any part (equal to €100,000 or any integral multiple of €1,000 in excess thereof) of that Holder's Notes pursuant to an offer (a 'Change of Control Offer') on the terms set forth in this Indenture."

83.     In addition, Section 5.01 of the 2024 Indenture governs "Merger, Consolidation or Sale of Assets."  This section provides that the Company may not directly or indirectly "sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries . . . . in one or more related transactions" unless the acquiring entity "assumes all the obligations of the Company under the Company Guarantee and this Indenture pursuant to agreements reasonably satisfactory to the Trustee."

84.     Thus, under Section 5.01 of the 2024 Indenture, transferees (including participants in the 2021 Exchange Offer) are required to assume all of the Company's obligations under the 2024 Indenture, but no provision was made for them to do so.

## <u>First Claim for Relief</u>

### (Breach of Contract Against All Defendants Except Law Debenture)

85.     UMB repeats and realleges each of the above allegations as if fully set forth herein.

86.     Section 4.17 of the 2024 Indenture prohibits the designation of the Intralot US entities as "Unrestricted Subsidiaries" unless there was sufficient availability under the "Restricted

Payments" or the "Permitted Investments" categories to accommodate the "Fair Market Value" of the Company's ownership interest in Intralot US, which would be deemed an "Investment."

87.    The Company impermissibly designated the Intralot US entities "Unrestricted Subsidiaries" because the value of Intralot US exceeded the Permitted Investment basket in clause (ii) of Section 4.17.  The value of Intralot US also exceeded the lower Restricted Payments basket in clause (i) of Section 4.17.

88.    The Company could not rely upon the effects of the Sequencing Scheme to artificially reduce the Fair Market Value of its ownership interest in Intralot US before designating the Intralot US entities "Unrestricted Subsidiaries" because the Exchange Offers were an integrated transaction, each dependent upon the execution of the other, and both closing on the same day.

89.    The Company's designation of the Intralot US entities as "Unrestricted Subsidiaries" breached the express obligation for the Company's Board to act in good faith when determining whether to designate a subsidiary an "Unrestricted Subsidiary."

90.    The Intralot Entities' actions also breached the implied covenant of good faith and fair dealing in the 2024 Indenture.

## Second Claim for Relief

### (Breach of Contract Against All Defendants Except Law Debenture)

91.    UMB repeats and realleges each of the above allegations as if fully set forth herein.

92.     Even if it were proper for the Company to rely upon the Sequencing Scheme to reduce the Fair Market Value of its ownership interest in Intralot US, which it was not, the components of the Sequencing Scheme separately violated the 2024 Indenture.

93.     Specifically, the conveyance of 35% of TopCo to the 2024 Noteholders that participated in the 2024 Exchange Offer violated Section 4.11 of the 2024 Indenture.

94.     Section 4.11 of the 2024 Indenture prohibited the Company and any Restricted Subsidiary from selling its ownership interest in Intralot US without receiving "consideration at the time of the Asset Sale at least equal to the Fair Market Value of the . . .Equity Interests issued or sold or otherwise disposed of."

95.     The Company did not receive adequate consideration in exchange for the 35% ownership interest of Intralot US that it transferred to TopCo at the closing of the 2024 Exchange Offer.

96.     Similarly, the issuance of the New Preferential Secured Notes out of Intralot, Inc., at the time a Restricted Subsidiary, violated the 2024 Indenture's restriction on "Permitted Debt".

97.     The 2024 Indenture defines "Permitted Refinancing Debt" as "any Debt of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, refinance, renew, replace, defease, exchange, discharge or refund other Debt of such Person (other than intercompany Debt)."   The €202 million Intralot, Inc. debt did not "extend, refinance, renew, replace, defease, exchange, discharge or refund other Debt" of Intralot, Inc., and therefore was not a Permitted Refinancing Debt.

### Third Claim for Relief

**(Breach of Contract Against All Defendants Except Law Debenture)**

98.     UMB repeats and realleges each of the above allegations as if fully set forth herein.

99.     Because the Exchange Offers and the Sequencing Scheme violated Section 4.17 of the 2024 Indenture the Intralot US entities should have remained Restricted Subsidiaries.

100.     As Restricted Subsidiaries, the liens given to secure solely the New Preferential Secured Notes violated Section 4.10 of the 2024 Indenture, which prohibits the Company and any Restricted Subsidiary from incurring liens, except for Permitted Liens, unless the 2024 Notes are granted an equal and ratable Lien.

### Fourth Claim for Relief

**(Breach of Contract Against All Defendants Except Law Debenture)**

101.     UMB repeats and realleges each of the above allegations as if fully set forth herein.

102.     The 2021 Exchange Offer resulted in a disposition of "all or substantially all" of the assets of the Company, including granting liens on the assets and stock of Intralot US and severing Intralot US and its subsidiaries and their assets from the Issuer and the Company.

103.     The 2021 Exchange Offer thus resulted in a Change of Control as that term is defined in the 2024 Indenture.

104.     Upon the occurrence of a Change of Control, the 2024 Indenture required the Issuer to give 2021 Noteholders the opportunity to put the notes to the Issuer at 101% of par plus accrued interest.

105.    The Issuer did not give 2024 Noteholders the opportunity to put the notes to the Issuer at 101% of par plus accrued interest.

106.    Section 5.01 of the 2024 Indenture requires that transferees (such as participants in the 2021 Exchange Offer) must assume all of the obligations under the applicable guarantee and the 2024 Indenture pursuant to terms reasonably satisfactory to the Trustee.

107.    The Exchange Offers made no provision for the participants in the 2021 Exchange Offer to assume all of the obligations under the applicable guarantee and the 2024 Indenture pursuant to terms reasonably satisfactory to the Trustee.

108.    The Exchange Offers, therefore, violated Sections 4.15(a) and 5.01 of the 2024 Indenture.

## PRAYER FOR RELIEF

Wherefore, UMB demands judgment on each of its claims for:

1.  Compensatory damages or, in the alternative, rescission or the imposition of an equal and ratable lien on the Intralot US entities in favor of the 2024 Noteholders;

2.  Attorney's fees, expenses, and costs;

3.  Interest; and

4.  Such other and further relief as may be appropriate.

Dated:  April 20, 2022

GREENBERG TRAURIG, LLP

By:  */s/  Robert A. Horowitz*
Robert A. Horowitz
horowitzr@gtlaw.com
Jason Kislin
kislin@gtlaw.com
One Vanderbilt Ave
New York, NY 10017
(212) 801-9200

*Attorneys for Plaintiff UMB BANK, N.A., as Successor Trustee under the Trust Indenture dated September 20, 2017 regarding €500,000,000 5.250% Senior Notes due 2024 issued by Intralot Capital Luxembourg S.A*

and

Dennis Hranitsky
dennishranitzky@quinnemanuel.com
Daniel Holzman
danielholzman@quinnemanuel.com
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7242

*Of Counsel for Plaintiff UMB BANK, N.A., as Successor Trustee under the Trust Indenture dated September 20, 2017 regarding €500,000,000 5.250% Senior Notes due 2024 issued by Intralot Capital Luxembourg S.A*